**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jack Raymond SCOTT,
Defendant-Appellant.**

**Nos. 74–1580, 74–1581.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 11, 1974.

Decided Feb. 19, 1975.

Certiorari Denied June 2, 1975.

See 95 S.Ct. 2403.

Raymond Rosenberg, Des Moines, Iowa, for defendant-appellant.

Alan H. Kirshen, Asst. U. S. Atty., Sioux City, Iowa, for plaintiff-appellee.

Before LAY and BRIGHT, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

Jack Raymond Scott was convicted of participating in a series of bank robberies in small Iowa towns. He argues to us on appeal, in essence, that his trial was unfair. We find no prejudicial error and affirm the judgment of conviction.

The facts are extensive, involving robberies of banks at Breda, Ionia, Randall, and Swaledale, Iowa. Concerning specific issues raised, the facts will be examined in detail, but in general a similar pattern of operation emerged as to all the victim banks. The robberies were directed against smalltown institutions; each robbery took place in the pre-dawn hours of a Monday, and involved similar methods of forcing entry into the banks (pry bars) and into the safes (acetylene torches and "burning bars"). The banks robbed fall roughly into two groups, those at Breda and Ionia having taken place during the period from June to September, 1969, and those at Randall and Swaledale occurring in October and November, 1970.

The Randall and Swaledale robberies were the subject of the first indictment, containing six counts, brought against defendant Scott and others.[1] For purposes of clarity this will hereafter be referred to as the Randall indictment.

With respect to this Randall indictment, the defendant moved for severance of defendants, and for a severance of the offenses and for a separate trial on Counts I, III, and V from Counts II, IV, and VI.[2] Such relief was sought under Fed.R. Crim.P. 14, authorizing the court to order separate trials on counts, to grant a severance of defendants, or to provide whatever relief justice requires.

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. In brief summary it charged violations of 18 U.S.C. § 2113, Bank robbery and incidental crimes, specifically as follows: Counts I, III, and V, charged the defendant Jack Raymond Scott, Dwight Morgan Bachman, and Robert Weeks, as defendants with crimes involving the Randall State Bank, Randall, Iowa, on October 19, 1970, as follows:

Count I—Violation of 18 U.S.C. §§ 2 and 2113(a) (entering with intent to commit a felony);

Count III—Violation of 18 U.S.C. §§ 2 and 2113(b) (carrying away with intent to steal);

Count V—Violation of 18 U.S.C. §§ 2 and 2113(c) (possession and concealing).

Counts II, IV and VI charged the defendant, Jack Raymond Scott, and Dwight Morgan Bachman, only, as defendants, with the crimes involving the Swaledale office of First State Bank of Thornton, Iowa, on November 2, 1970, as follows:

Count II—Violation of 18 U.S.C. §§ 2 and 2113(a) (entering with intent to commit a felony);

Count IV—Violation of 18 U.S.C. §§ 2 and 2113(b) (carrying away with intent to steal);

Count VI—Violation of 18 U.S.C. §§ 2 and 2113(c) (possession and concealing).

2. See note 1, supra. The severance motion was summarized by the District Court in the following terms:

Defendants are charged in a six-count indictment with various crimes of bank robbery in October and November of 1970, in violation of 18 U.S.C. §§ 2, 2113.

*Severance of Defendants and Offenses*

Each defendant has moved for a severance from the other defendants charged, contending that: (1) some defendants have prior felony convictions; (2) some defendants may testify and some may not and their defenses may be inconsistent; (3) the government's proof may include evidence of statements or admissions of a defendant admissible against such defendant but not against the other defendants; and (4) the other defendants would appear and testify to matters exculpatory and explanatory to a defendant's defense if the defendants were tried separately.

Each defendant also seeks severances of Counts I, III and V from Counts II, IV and VI contending that: (1) they involve separate and distinct offenses provable by different evidence; (2) joinder may allow the jury to accumulate evidence; and (3) a defendant may desire to testify as to some of the offenses charged and not as to others.

Thereafter, and prior to the court's ruling on the motion, a second indictment was returned (hereinafter the Conspiracy indictment). This indictment, in one count, charged a conspiracy among defendants Scott, Bachman and Weeks, together with another six named but unindicted persons "and others to the Grand Jury unknown," to commit various crimes of bank robbery over a period of time from June 11, 1969 (the Breda robbery was on June 30) to November 12, 1970 (the Swaledale robbery was on November 2, 1970). This indictment included as overt acts the Randall and Swaledale robberies, which were the subject of the Randall indictment, as well as the earlier robberies of the banks in Breda, Irwin, and Ionia, Iowa.[3]

Pursuant to Fed.R.Crim.P. 13, and without objection, the Conspiracy indictment was consolidated for purposes of trial with the Randall indictment, and it was agreed on the first day of trial that defendant's motion for severance would apply as well to the Conspiracy indictment.[4] Additionally, at the close of the government's case the defendant stated that he "would like to renew at this time the motions for severance of the defendants and the motion for the severance of

the charges heretofore filed in this matter." The motions were denied on the following day and, the defendants offering no evidence, the case went to the jury, resulting in the conviction of defendant Scott on all six counts of the Randall indictment and on the single count of the Conspiracy indictment.[5] He was sentenced to 15 years on counts I, III and V and 15 years on counts II, IV and VI of the Randall indictment, and to 5 years on the Conspiracy indictment, all sentences to run concurrently with each other.[6]

Defendant's appeal raises no question as to his guilt or innocence. In fact, at the trial he made no effort to disprove the illegal acts encompassed within the various counts. What he complains of, rather, is the course of the trial. He asserts in particular that the conspiracy alleged in the Conspiracy indictment was not one overall conspiracy, as alleged, but two separate and distinct conspiracies joined together "for the purpose of evasion or avoidance of the evidentiary rules." Had the alleged two conspiracies been separately charged, it is argued, "it would have raised both questions of misjoinder under Rule 8(a) and (b) and prejudicial joinder under Rule 14 which the

---

3. Overt acts charged included the meetings of the alleged conspirators, their surveillance of potential victim banks, their acquisitions of paraphernalia, their utilization of motor vehicles, and other acts relating to the accomplishment of the alleged conspiratorial objectives. Overt acts 5 through 9 inclusive, involved charges of entering certain banks with intent to commit larceny, as follows:

> 5. June 30, 1969, Breda Savings Bank, Breda, Iowa;
> 6. July 30, 1969, Farmers Savings Bank, Irwin, Iowa;
> 7. September 1, 1969, First Security Bank and Trust Company, Ionia, Iowa;
> 8. October 19, 1970, Randall State Bank, Randall, Iowa;
> 9. November 2, 1970, First State Bank of Thornton, Swaledale, Iowa.
> No proof was adduced at trial concerning the Irwin robbery.

4. MR. ROSENBERG [counsel for defendant]: Your Honor, we wanted to clear up one thing, or two things. First on the matter of severance. The second indictment

was returned sometime prior to the Court's ruling on the matter of severance which I understand you reserved ruling on and we wanted the record to indicate that we desire to sever, or the motion for severance applied to the second indictment as well as to the various counts of the first. We haven't filed any formal motion.

THE COURT: They are considered as applying to the two indictments as consolidated.

MR. ROSENBERG: So we would like to have our motion for severance to apply to that for the same reason and on the same grounds previously urged to the severance of the two groups of counts in the first indictment.

5. Co-defendant Weeks was acquitted on all counts, and co-defendant Bachman pled guilty to two counts before the case went to the jury.

6. We find no occasion upon the facts before us for employment of the concurrent sentence doctrine. *United States v. Irby*, 480 F.2d 1101, 1102 (8th Cir. 1973).

trial court could have better determined from the beginning," rather than after the proofs were in, at which time a trial court is "reluctant" to sever.

■ We find no merit in the asserted errors in the severance issue. The claim for severance under Fed.R.Crim.P. 8 clearly fails because of the commonality of the proofs involved, both as to offenses and defendants.[7] Broad interpretation of Rule 8, having as its foundational precept the prompt and efficient administration of criminal trials, in no way "detracts from the rights of individuals to avoid prejudicial joinder."[8] Should it develop at any stage of the trial that prejudice appears from joinder, Fed.R.Crim.P. 14 authorizes the court to order separate trials of counts, grant a severance of defendants "or provide whatever other relief justice [may] require[s]."[9] The ruling of the trial court in this respect we overturn only for an abuse of discretion. Miller v. United States, supra, note 8, at 1293, and cases there cited. Here, even assuming that the defendant's motion at the close of the government's case[10] raised the issue here presented and argued as to multiple conspiracies, a matter of substantial doubt,[11] we find no abuse of discretion in the court's rulings, nor do we find plain error under Fed.R.Crim.P. 52(b).

The defendant argues to us that his contention "is similar to the legal argument made" in Miller v. United States, supra note 8, at 1294, which he quotes as follows:

Appellants' basic position is that the evidence shows as a matter of law the existence of separate conspiracies. They assert that "[t]he record indicates that there were in fact two separate and distinct conspiracies proved. One regarding the Camdenton, Missouri Post Office and the other regarding the alleged breakins and entries of post offices thereafter." From this premise they argue that the Camdenton count was divorced from the others and should have been severed. Interwoven in the argument presented is the failure to sever the conspiracy count from the substantive counts. We disagree.

The prosecution of a continuing criminal enterprise raises questions of the utmost complexity with respect to the

7. Fed.R.Crim.P. 8 provides:

    Joinder of Offenses and of Defendants

    (a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

    (b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

8. Miller v. United States, 410 F.2d 1290, 1293 (8th Cir.), cert. denied, 396 U.S. 830, 90 S.Ct. 81, 24 L.Ed.2d 9 (1969), quoting Lay, J. in Haggard v. United States, 369 F.2d 968, 973 (8th Cir. 1966), cert. denied, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967).

9. Fed.R.Crim.P. 14 provides:

    Relief from Prejudicial Joinder

    If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

10. Note 4 *supra.*

11. We note also that the court's charge repeatedly employed without objection the expression "*the* conspiracy charged," *e. g.,* "If the jury should find beyond a reasonable doubt from the evidence in the case that existence of *the* conspiracy charged in the indictment has been proved and that during the existence of *the* conspiracy * * * *." (Emphasis added.) No issue is raised before us as to this or similar instructions.

identification of the conspiracies involved, whether single or multiple. The problem is the more compelling because of the intertwining of Fed.R.Crim.P. 8, as to proper joinder, with Fed.R.Crim.P. 14, requiring a severance at times, and Fed.R.Crim.P. 52(a), dealing with substantial prejudice, particularly applicable to problems of alleged variance. The differentiation between the overall continuing conspiracy, with various parties entering and leaving the criminal association at various times, and separate conspiracies, with certain parties common to all, defies any easily applicable litmus.[12] The "common pictorial distinction"[13] between the "spoke conspiracy"[14] and the "chain conspiracy"[15] helpful in the simpler cases, tends to become blurred as the ends of the chains themselves may generate spokes, or the spokes themselves proliferate chains. Rather than pushing the pictorial distinction to extremes, the courts find it more useful, in arriving at a reasonable and just decision as to any particular conspiratorial issue, to consider a calculus: a) the possibility of subsequent prosecution for the same offense;[16] b) the defendant's possession of reasonably specific information as to

the charges against him;[17] and c) the "dangers of transference of guilt from one [defendant] to another across the line separating conspiracies."[18]

■ It is this latter consideration that disposes of the issue before us. Whether the facts present a single overall conspiracy, as the government claims, or two separate conspiracies, as defendant argues, is immaterial in this case and we do not reach decision thereon. The fact of the matter is that if, as defendant argues, there were in truth two conspiracies, defendant Scott was a participant in each. One conspiracy, defendant asserts, if any existed, was that involving the Breda and Ionia banks. Yet with respect to the Breda robbery, for example, there was ample evidence from which the jury could find Scott's participation.[19] An entirely separate conspiracy defendant argues, was that involving the Randall and Swaledale robberies. Yet here again defendant Scott was clearly one of the robbers in the Swaledale robbery, for example, according to the testimony of the unindicted co-conspirator McWilliams who described the operation in detail.[20]

12. Helpful discussion may be found in Developments in the Law, Criminal Conspiracy, 72 Harv.L.Rev. 920, 922–35, 991–93 (1959); Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387 (1957); 65 Nw.U.L. Rev. 134 (1970).

13. Friendly, J., in United States v. Borelli, 336 F.2d 376, 383 (2nd Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

14. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

15. United States v. Cirillo, 468 F.2d 1233, 1238 (2nd Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

16. Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1934).

17. *Id.*

18. Kotteakos v. United States, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).

19. With regard to the robbery at the Breda bank of June 30, 1969, one of the banks in the Breda-Ionia group which defendant characterizes as comprising a separate and earlier conspiracy, testimony of a merchant disclosed that an oxygen tank, serial No. R–32791, an acetylene regulator, and an acetylene cylinder

had been purchased from him by two men, one of whom was defendant Scott, who also returned with a companion at a later date in June, 1969, and purchased welding goggles and a pair of Racine Blue Devil 711 welding gloves. Among the physical evidence left behind at the time of the Breda robbery was oxygen tank No. R–32791, a pair of Racine Blue Devil 711 welding gloves, and an acetylene regulator of the same model earlier sold to Scott.

20. The Swaledale bank robbery, which defendant asserts was a part of a second and independent conspiracy, was perpetrated by defendants Scott and Bachman and by Willard Martin and Thomas McWilliams, the latter of whom turned state's evidence. Martin and Scott did the detailed planning, going to a small town and employing the same time of week and safe cutting techniques as in the other of the series. The use of a white Ford Maverick in the robbery, as described by McWilliams, was corroborated by other testimony linking defendant Scott therewith. The passage of a truck nearby, described by McWilliams as causing a suspension of operations, was corroborated by the truck driver. Blank money orders from the bank were removed to Scott's possession and were later forged and cashed, some in Equador.

The difficulty and the danger faced in the multiple conspiracy cases, where the defendant is part of one conspiracy but not of another, is the likelihood of prejudice affecting substantial rights arising from a "prejudicial spillover effect"[21] from one conspiracy to another. However, if the defendant is a member of both conspiracies the danger of prejudice from this source is minimal, if not nonexistent. We find no prejudice from this source on the facts before us.[22]

■ Defendant urges error in the receipt of evidence. The government called to the stand one Reginald Wright, a prisoner at the State Penitentiary in Fort Madison, Iowa. He testified that he had known the defendant in the early part of 1972 and that defendant had told him that he (Scott) "was the best safe cutter in the country." The statement was clearly an admission and so receivable. Bass v. United States, 326 F.2d 884 (8th Cir.), cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964); Segal v. United States, 246 F.2d 814, 818 (8th Cir. 1957), cert. denied, 355 U.S. 894, 78 S.Ct. 269, 2 L.Ed.2d 192 (1957).[23]

■ In the cross-examination of the same witness he testified, in answering a question as to the felony for which he was incarcerated, that it was for "chemicals that I bought from Scott." This is attacked on the ground that it is "evidence offered of other crimes, for the purpose of establishing a probability that the defendant committed the crime" charged. The testimony given does not reasonably support the argument made. The answer was not responsive to the question asked; the court promptly gave a cautionary instruction and ordered that the answer be stricken. Such passing reference, without hint of prosecutorial instigation or participation, was in our judgment immediately cured by the trial court, and did not constitute prejudicial error.[24]

■ With respect to each of these incidents defendant moved for mistrials, which motions the court denied. The allowance of a mistrial is a matter for the trial court's discretion.[25] There is nothing in the circumstances or testimony relating to the rulings thus made to justify our finding the "clear and obvious abuse of a trial court's discretion" which mandates reversal.[26]

Defendant also complains of the testimony of Willard Martin, a named but unindicted co-conspirator. He had informed the government that he "was unwilling to testify against Mr. Scott and Mr. Bachman to the extent that if he were questioned about this * * * he would take the Fifth Amendment." He was called upon the theory that his testi-

---

**21.** Haggard v. United States, 369 F.2d 968, 975 (8th Cir. 1966), cert. denied, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967).

**22.** *See* United States v. Wilson, 497 F.2d 602, 605 (8th Cir. 1974); United States v. Benjamin, 328 F.2d 854, 864 (2nd Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964); Ritter v. United States, 230 F.2d 324, 329 (10th Cir. 1956); Quirk v. United States, 161 F.2d 138, 142 (8th Cir. 1947); Canella v. United States, 157 F.2d 470, 478–79 (9th Cir. 1946).

**23.** *See also* 6 J. Wigmore, Evidence § 1732, at 99 (3rd ed. 1940): "any and every statement of an accused person, so far as not excluded by the doctrine of confessions * * * or by the privilege against self-incrimination * * * is usable *against him* as an admission * * *," quoted in United States v. Rouse, 452 F.2d 311, 313 (5th Cir. 1971); 2 C. Wright, Federal Practice and Procedure § 413, at 148 (1969); Federal Rules of Evidence 801(d)(2), Jan. 2, 1975, Pub.L. No. 93-595, 88 Stat. 1938–1939.

**24.** *See* United States v. Gocke, 507 F.2d 820 (8th Cir. 1974); United States v. Carter, 448 F.2d 1245 (8th Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 802 (1972); United States v. Christian, 427 F.2d 1299, 1301–04 (8th Cir.), cert. denied, 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970); Evenson v. United States, 316 F.2d 94–96 (8th Cir. 1963); Reistroffer v. United States, 258 F.2d 379, 393 (8th Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959).

**25.** Frohmann v. United States, 380 F.2d 832, 835 (8th Cir. 1967); Evenson v. United States, 316 F.2d 94, 95–96 (8th Cir. 1963).

**26.** Schaefer v. United States, 265 F.2d 750, 753 (8th Cir.), cert. denied, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959).

mony concerning his date of coming to Iowa, and his residence and associates there, would corroborate that of other forthcoming witnesses, that his testimony would in particular corroborate that of witness McWilliams, another unindicted co-conspirator, and that his expertise in safecracking would tend to establish a *modus operandi* showing a common plan or scheme which encompassed the 1969 burglaries.

He was so questioned, counsel carefully skirting any possible Fifth Amendment claim. He testified as to his extensive criminal record, involving robbery, kidnapping, and the attempted murder of a policeman, together with other felonies, that he knew defendant Scott, that he settled in Iowa with Scott's help, that he knew and lived with the Powers,[27] and testified in detail concerning the opening of safes, the use of acetylene torches and "burning bars," exemplifying his verbal descriptions by reference to pictures previously introduced into evidence of the burgled safes involved in the case.

Counsel for defendant briefly cross-examined and then, wisely we think, refused to proceed further. He moved for a mistrial asserting that he was being compelled to "watch a person named as participant in these crimes appear and not be permitted or not be able to interrogate him." He argued, with respect to cross-examination by him: "If I proceed to interrogate this witness, if he takes the Fifth Amendment on me, I am damned because he is a co-conspirator" and, also, that "if he proceeds to testify in some fashion, I do not know what type of statements are lurking around

here * * *, and I am presented with the problem and [sic] defense of my client that I should not be presented with in all conscience and all good faith."

■■ This, obviously, is not the usual Fifth Amendment controversy regarding the effect of the assertion of the claim of privilege upon the conduct of the trial, or the use sought to be made by the prosecutor of adverse inferences from refusal to testify, or, indeed, an attempt by the government "to build its case out of inferences arising from use of the testimonial privilege."[28] Here the Fifth was never invoked; yet the witness was, because of the Fifth, for all practical purposes immune from cross-examination. The procedure does not commend itself to us, particularly in view of the nonessential nature of his testimony.[29] The right of a defendant to be confronted with a witness against him includes the right to cross-examine such witness.[30] Yet here such right was effectively foreclosed. The individual rules of evidence leading to the result are in themselves unassailable. Thus it is the part of wisdom to disclose a witness' record, if he has one, before the other side itself compels such disclosure. Yet a combination of individually unassailable "rules" may in their totality result in a trial situation unacceptable to our system of justice, here the preclusion of searching cross-examination of an alleged participant in the robberies.

The Fifth Amendment cases lend themselves to no *a priori rule*. Each case must be judged on its own facts. We weigh the obligation and the duty of a citizen to testify in court, "a vital and

27. Mark Powers became acquainted with defendant Scott in Des Moines. When he (Powers) moved to Carroll, Iowa, he met Martin who, with his family, lived for a time in the Powers' home. Martin introduced McWilliams to Powers as his son. It was in the basement of the Powers' home that large quantities of coins were counted on October 20th, some being given to Powers. Scott told him that they "took off a bank."

28. Namet v. United States, 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963).

The leading cases in the area may be found in United States v. King, 461 F.2d 53, 57 (8th Cir. 1972).

29. We note that the prosecution's next witness, a repairman who had worked on the vaults and safes in question, had ample expertise to establish the *modus operandi*. Indeed, much of his testimony was cut short by the court as repetitive of Martin's.

30. Pointer v. Texas, 380 U.S. 400, 404–05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

necessary part of our adversary trial system," [31] against his constitutional rights and privileges, all viewed within the context of the fair and impartial trial. It would have been preferable, under the circumstances we have outlined, had the witness not been called or his testimony stricken. We are not, however, persuaded that the admission of his testimony is a ground for reversal. In view of the overwhelming evidence against defendant it is properly viewed as "no more than [a] minor lapse[s] through a long trial," not affecting the substantial rights of the defendant.[32]

We affirm.

**31.** United States v. Brickey, 426 F.2d 680, 688 (8th Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970).

